UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PATRICK SMITH, JR.,

        Plaintiff,

Case No. 20-12013

HON. MARK A. GOLDSMITH

vs.

TIM AIMS, et al.,

        Defendants.

_____/

**OPINION & ORDER
(1) ACCEPTING THE RECOMMENDATION CONTAINED IN
THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION (Dkt. 58), (2)
OVERRULING PLAINTIFF'S OBJECTIONS (Dkt. 59), AND (3) GRANTING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Dkt. 30)**

      This matter is presently before the Court on the Report and Recommendation (R&R) of Magistrate Judge David R. Grand (Dkt. 58). In the R&R, the magistrate judge recommends that the Court grant the motion for summary judgment filed by Defendants Luna Pier City Police Department Chief Tim Aims, Luna Pier Mayor Dave Davison, Luna Pier Police Officer Drew Weiler, and the Luna Pier Police Department (Dkt. 30). Pro se Plaintiff Patrick Smith, Jr. filed a reply brief objecting to the R&R (Dkt. 59). For the reasons that follow, the Court overrules Smith's objections and adopts the recommendation contained in the magistrate judge's R&R to grant Defendants' motion for summary judgment.[1]

---

[1] Defendant Rich Leichty also joined in Defendants' motion, but the Court has already dismissed Smith's claims against Leichty (Dkt. 39). Oral argument will not aid the Court's decisional process, and so Defendants' motion for summary judgment will be decided based on the parties' briefing and the R&R. See E.D. Mich. LR 7.1(f)(2). In addition to the motion, the briefing includes Smith's response to Defendants' motion for summary judgment (Dkt. 40), Defendants'

# I. BACKGROUND

Smith alleges that he was "improperly accused of domestic abuse" after he and his wife, Jennifer Smith, had an "argument." Compl. at PageID.13 (Dkt. 1).[2] Smith states that he punched a mirror and threw a dresser drawer, accidently striking his wife with its contents. Id. at PageID.16. In the aftermath of this "marital disagreement," Smith instructed his nephew, Gary Herin—who was in the house and witnessed part of the dispute—to "call 911 for medical for Jennifer [S]mith." Id. at PageID.13. Smith then left the house. Id. Weiler, an officer with the Luna Pier Police Department, arrived at the Smith residence to respond to the situation. Id. at PageID.14.

Weiler's response to the incident and interactions with Smith are documented on his body camera, a recording of which was provided by Defendants as an exhibit to their motion for summary judgment. See Body Camera (Dkt. 36).[3]

Weiler arrived at Smith's home at approximately 20:21:50. Id. He stated that he was responding to a "possible assault." Id. at 20:21:54. Weiler was greeted at the door by Herin, who escorted Weiler to Jennifer. Id. at 20:22:02–20:22:14. Jennifer was lying on the floor and did not get up when Weiler entered the house. Id. at 20:22:05. When Weiler asked her what happened,

---

reply (Dkt. 45), and Defendants' response to Smith's objections (Dkt. 60).

[2] The Court refers to Plaintiff Patrick Smith, Jr. as "Smith" and to Jennifer Smith as "Jennifer."

[3] Weiler's body camera footage is split into seven sequential segments. The Court cites to the time stamp in the bottom right corner of the body camera footage, which reflects the time on July 22, 2018. The seven segments of body camera footage reflect (i) Weiler's arrival and interactions at Smith's residence, see Body Camera at 20:21:47–20:51:47; (ii) Weiler's interactions in the yard outside Smith's residence, see id. at 20:51:47–20:54:04; (iii) Weiler's interactions with Smith outside the Iron Coffins Motorcycle Club, see id. at 20:59:40–21:29:30; (iv) Weiler's transportation of Smith to Monroe County Jail and interactions with him at that location, see id. at 21:37:28–21:48:42; (v) Weiler's transportation of Smith to the hospital and interactions with him at that location, see id. at 22:00:29 – 22:30:29; (vi) Weiler's further interactions with Smith at the hospital, see id. at 22:30:29–22:33:04; and (vii) Weiler's interactions with Smith back at Monroe County Jail, see id. at 23:45:54 – 23:47:24.

Jennifer indicated quietly that she had had a confrontation with her husband, who then "took off." Id. at 20:22:15. Her tone and shallow breathing suggested distress or possibly pain; for example, the pitch of Jennifer's voice rose when she explained that Smith had taken her car: "I can't have my car impounded; it's the only one I have." Id. at 20:22:38.

Herin and Jennifer described Smith and the vehicle he was driving, and Weiler relayed this information to dispatch. Id. at 20:22:40. When asked what Smith had thrown at her, Jennifer said, "I don't know," and Herin stated that Smith had thrown a speaker at her. Id. at 20:23:33. Herin explained that it "laid her down pretty quick" and that she was not "moving very well." Id. at 20:23:45.

Medical personnel entered the residence, and Jennifer told the medical personnel that it hurt to move. Id. at 20:24:38. While the medical personnel provided care, Jennifer stated that Smith hit her twice in the back when he threw something at her. Id. at 20:29:40. She also stated that her ear was bruised. Id. at 20:30:05.

While medical personnel attended to Jennifer, Weiler asked questions of the other individuals who had witnessed the incident: Herin and Chris Bondie. Herin had been upstairs when the incident started, and he heard yelling, so he and Bondie went downstairs to intervene and found Smith and Jennifer arguing. Id. at 20:31:00. Herin said that Smith had been "throwing some stuff around," but "at this point, he wasn't trying to go at her." Id. at 20:31:15. When Herin and Bondie tried to intervene, that "pissed [Smith] . . . off more." Id. at 20:31:21. Herin also confirmed that he had seen Smith throw a speaker at Jennifer. Id. at 20:27:45.

Bondie told Weiler that he came downstairs when he heard noises, and Smith acted like he felt threatened when Herin and Bondie tried to calm him down. Id. 20:34:40 – 20:35:20. Bondie

3

stated that he had tried to shield "stuff on the wall" when Smith was throwing things. 20:36:00–20:36:40.

Weiler then spoke to Jennifer, who was still lying on the ground with her head sideways against the couch. Id. at 20:37:40. When asked what happened, Jennifer said, "I really don't know." Id. at 20:37:45. Jennifer explained to Weiler that Smith "snapped" and told Jennifer that she was getting an attitude. Id. at 20:37:45. The situation then "escalated." Id. at 20:38:10. Smith starting "going nuts." Id. at 20:38:25. Jennifer stated that this behavior wasn't "like" him. Id. at 20:38:55. She was not sure at what point he threw the speaker at her. Id. at 20:39:20.

The examination of Jennifer revealed injuries resulting from the altercation. Medical personnel identified an injury on her lower back. Id. at 20:30:45. Weiler confirmed with medical personnel that Jennifer had injuries to her lower back, and he took a picture of the injuries. Id. at 20:40:50. She said it hurt to move her legs. Id. at 20:41:14. She also identified an injury on her left ear. Id. at 20:41:25. When moved onto a wheelchair, Jennifer expressed pain and stated that she could not sit on her left side. Id. at 20:45:00.

Jennifer also indicated that Smith had thrown a bottle of pesticide at her. Id. at 20:41:40. Herin said that the pesticide had been "dumped everywhere," id. at 20:42:40, and he identified the bottle, id. at 20:43:50.

Weiler left Smith's residence and arrived at the Iron Coffins Motorcycle Club, where Officer Parker Gutschow of Erie Township—having received information Weiler sent to dispatch—was detaining Smith in the back of his police vehicle. Id. at 20:59:45. Smith insisted that all he did was break his own property. Id. at 21:00:42. He stated: "I do not know if anything hit . . . [Jennifer], but I think something did fall and hit her. I'm not gonna lie to you about that . . . . But did I mean it? Probably no." Id. at 21:00:45–21:01:05. He further stated: "I never fucking

4

put my hands on her. I don't give a damn. Did I throw shit? Hell yes I threw shit. Did shit probably hit her? Hell yeah." Id. at 21:02:50–21:03:00.

Weiler continued to ask Smith about the incident, and Smith explained that he had been emotionally troubled and arguing with his wife for days, continually insisting during his explanation that he had not put his hands on her. Id. at 21:08:35–21:13:20. Smith expressed anger with his wife, stating that he was not returning home and exclaiming, "Fuck her." Id. at 21:12:15. Weiler noted that Jennifer had suffered injuries, and Smith repeated that he had not hit her, explaining: "that's like saying, okay, if I throw a whole bunch of shit and it hits somebody—I can't judge that it's gonna hit that person." Id. at 21:13:20–21:14:13.

Smith asked if he was going to jail, and Weiler confirmed that Smith was going to jail for domestic assault. Id. at 21:24:05. When Smith questioned this conclusion, Weiler explained, "even though you didn't put your hands on her, you threw something at her which hit her." Id. at 21:24:20.

Weiler then drove Smith to Monroe County Jail. While in the backseat of the car during the trip, Smith continued to insist that he had not hit anybody. Id. at 21:38:10. He grew increasingly angry at Weiler for taking him to jail. See, e.g., id. at 21:39:50. Smith required medical clearance before he could be admitted at Monroe County Jail, so Weiler drove Smith to the hospital before bringing him back to the jail. See id. at 22:04:20–22:05:05.

Smith brings multiple claims under 42 U.S.C. § 1983: (i) claims for false arrest and malicious prosecution in violation of the Fourth Amendment against all Luna Pier Defendants; (ii) a claimed violation of his Fifth Amendment right against self-incrimination against all Luna Pier Defendants; and (iii) a Monell claim against Davison, Aims, and the Luna Pier Police Department

5

for negligently hiring and disciplining Weiler. Compl. at PageID.24–26.[4] Smith also brings state law claims against all Luna Pier Defendants for false arrest, malicious prosecution, negligence, and private nuisance. Id. at PageID.26–27. Smith also originally brought a claim against Gutschow for excessive force in violation of the Fourth Amendment based on the application of handcuffs to his hands, but Gutschow has been dismissed from this case. See R&R at 6 n.2. (citing 8/3/21 Order (Dkt. 55)).

Magistrate Judge Grand recommends that summary judgment in favor of Defendants is proper on all of Smith's claims. R&R at 22. Smith filed objections to the magistrate judge's recommendations as to each of his claims. See Obj.

## II. ANALYSIS

The Court reviews de novo any portion of the R&R to which a specific objection has been made. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); Alspaugh v. McConnell, 643 F.3d 162, 166 (6th Cir. 2011) ("Only those specific objections to the magistrate's report made to the district court will be preserved for appellate review; making some objections but failing to raise others will not preserve all the objections a party may have.") (punctuation modified). Absent a specific objection, the issue is waived. Willis v. Sullivan, 931 F.2d 390, 401 (6th Cir. 1991). Additionally, any issues raised for the first time in objections to an R&R are deemed waived. Uduko v. Cozzens, 975 F. Supp. 2d 750, 757 (E.D. Mich. 2013).

Smith objects to the R&R's recommendation for a grant of summary judgment in favor of Defendants on each of his claims.[5] Defendants state that Smith's objections "make[] multiple

---

[4] Monell allows a litigant to recover against a governmental entity under § 1983 when "execution of a government's policy or custom" inflicts the alleged constitutional injury. Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 694 (1978). A Monell suit can also be brought against "an individual in his official capacity," which is "the equivalent of a suit against the governmental entity." Matthews v. Jones, 35 F.3d 1046, 1049 (6th Cir. 1994).

[5] The Court applies the traditional summary judgment standard as articulated in Scott v. Harris, 550 U.S. 372, 380 (2007). The movant is entitled to summary judgment if that party shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a

6

factual allegations regarding his background for the first time, fail[] to specify the proposed findings or recommendations to which he objects, and repeat[] the arguments made in his response to Defendant's Motion for Summary Judgment." Resp. to Obj. at 1. The Court largely agrees, but it addresses the merits of each of Smith's claims in turn.

### A. False Arrest and Malicious Prosecution

Magistrate Judge Grand found that Weiler was entitled to qualified immunity on Smith's false arrest and malicious prosecution claims because Weiler had probable cause to arrest Smith for domestic violence. R&R at 9–12. As the R&R explained, "[p]robable cause exists where there is a fair probability that the individual to be arrested has either committed or intends to commit a crime." Fineout v. Kostanko, 780 F. App'x 317, 328 (6th Cir. 2019) (punctuation modified). Weiler is entitled to qualified immunity if he had at least "arguable probable cause." McLeod v. Bender, No. 13-12878, 2015 WL 1470071, at *14 (E.D. Mich. Mar. 30, 2015) (emphasis in original). A determination of whether an officer had probable cause examines "the facts and circumstances within the officer's knowledge and of which she had reasonably trustworthy information" at "the moment the officer seeks the arrest." Fineout, 780 F. App'x at 328. (punctuation modified).

Magistrate Judge Grand found that Weiler had probable cause to arrest Smith for domestic violence. R&R at 10 (citing Mich. Comp. L. § 750.81(2)) (". . . [A]n individual who assaults or assaults and batters his or her spouse or former spouse . . . is guilty of a misdemeanor . . ."). Considering the body camera's depiction of testimony from multiple witnesses, the state of Smith's house, Jennifer's apparent anguish and observable injuries, and Smith's own description of the incident, Magistrate Judge Grand concluded that "there is no material question of fact that

---

matter of law. Fed. R. Civ. P. 56(a). If the movant makes an initial showing that there is an absence of evidence to support the nonmoving party's case, the nonmovant can survive summary judgment only by coming forward with evidence showing there is a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324–325 (1986). Where police video footage "depict[s] all of the genuinely disputed facts," the Court "view[s] the facts in the light depicted by the videotapes." Rudlaff v. Gillispie, 791 F.3d 638, 639 (6th Cir. 2015) (citations omitted, punctuation modified).

7

Officer Weiler had at least arguable probable cause to believe Smith committed the crime of domestic violence. . . ." Id. at 12.

Smith makes two objections to this finding. He first notes that, in the proceeding that followed Smith's arrest, a magistrate found that there was no probable cause that Smith had committed a crime, and then the magistrate ordered his release from jail. Obj. at 8; Resp. to Mot. Summ. J. at 11. Smith argues that this finding "is evidence of the lack of probable cause" for Smith's initial arrest. Obj. at 8.

Magistrate Judge Grand aptly addressed this objection in the R&R. As he stated, "'[i]f the officers can establish that they had arguable probable cause to arrest the plaintiff, then the officers are entitled to qualified immunity, even if a court later determines that they did not actually have probable cause.'" R&R at 12 n.4 (quoting McLeod, WL1470071, at *9) (punctuation modified, emphasis in original). Magistrate Judge Grand further explained:

> Thus, even if, as Smith contends, a magistrate later found a "lack of probable cause to bind over" (ECF No. 40, PageID.486), that would be irrelevant to the determination of whether Officer Weiler reasonably – even if mistakenly – believed he had probable cause to arrest Smith on the day in question. See, e.g., [Michigan v.] DeFillippo, 443 U.S. [31,] 36 [(1979)] ("The validity of the arrest does not depend on whether the suspect actually committed a crime; the mere fact that the suspect is later acquitted of the offense for which he is arrested is irrelevant to the validity of the arrest.").

Id.

The Court agrees with Magistrate Judge Grand. The dismissal of charges against Smith following Smith's arrest provides no probative value as to "the facts and circumstances within the officer's knowledge" at "the moment the officer [sought] the arrest." Fineout, 780 F. App'x at 328 (punctuation modified). Smith's first objection is overruled.

Smith also challenges the magistrate judge's finding of probable cause by asserting that Weiler's investigation was insufficient for Weiler to conclude that there was a fair probability that Smith had assaulted his wife. Smith argues that, when deciding to arrest Smith, Weiler "failed to ascertain the nature or quality, or materiality of the marital disagreement." Obj. at 8. Smith asserts

8

that his actions did not place Jennifer in fear of assault, and that Jennifer never "testified" that Smith put her in this position. Id. Rather, "[Jennifer] understood the emotional state of her husband." Id. Smith suggests that Weiler "failed to appreciate a normal level of banter in the marriage." Id. If Weiler had conducted a "proper investigation," he would have determined "who actually started the dispute and who provoked whom." Id. at 9. Weiler failed to determine whether Smith was acting in self-defense. Id. He did "not personally witness[] any assault or battery." Id. Thus, Smith concludes, Weiler's decision to arrest Smith was unreasonable, and Weiler is not entitled to qualified immunity. Id.

The Court disagrees. Weiler's investigation provided a sufficient basis for Weiler to conclude that there was a fair probability that Smith had assaulted his wife. Weiler interviewed three first-hand witnesses at the site of the dispute, see Body Camera at 20:22:15–20:43:50, two of whom confirmed that Smith threw objects "at" Jennifer, see id. at 20:23:33; 20:39:20. He closely examined Jennifer's injuries. Id. at 20:40:50. Weiler was inside the residence for approximately thirty minutes, further discrediting any implication that his investigation was somehow careless. See id. at 20:21:47–20:51:47. Weiler then spent about another thirty minutes with Smith before transporting him to jail. See id. at 20:59:40–21:29:30. Weiler asked Smith about the incident, and Smith admitted that he had thrown items that "probably" hit Jennifer. Id. at 21:02:50–21:03:00.

Weiler's extensive review of the available facts provided a reasonable basis for concluding that the incident between Smith and Jennifer constituted more than—as Smith describes it—a "normal level of banter." Obj. at 8. Smith faults Weiler for not determining "who actually started the dispute and who provoked whom," id. at 9, but Weiler did in fact ask both Jennifer and Smith to explain the events leading up to the altercation, see Body Camera at 20:37:40; 21:08:30. Smith is also incorrect that Weiler lacked probable cause on the basis that he did "not personally witness[] any assault or battery," Obj. at 9, as an officer need only find a "fair probability" that an individual committed a crime to establish probable cause, Fineout, 780 F. App'x at 328 (punctuation modified). Weiler conducted a thorough and lengthy investigation, and as Magistrate Judge Grand

9

recounted, he had a broad factual basis for reaching his conclusion that there was probable cause that Smith had committed domestic assault. See R&R at 11–12.

For these reasons, Smith's second objection also fails. Summary judgment is proper for Smith's claims for false arrest and malicious prosecution.

### B. Self-Incrimination

The magistrate judge found that—even if Smith had been interrogated without being given a Miranda warning—there was no violation of Smith's Fifth Amendment right against self-incrimination. See R&R at 13–14. As Magistrate Judge Grand observed, "the mere failure to provide a Miranda warning does not violate a person's constitutional rights and cannot form the basis for a § 1983 action." Id. (citing Chavez v. Martinez, 538 U.S. 760, 772–773 (2003); Michigan v. Tucker, 417 U.S. 433, 444 (1974); Connecticut v. Barrett, 479 U.S. 523, 528 (1987)). The Fifth Amendment's Self-Incrimination Clause provides protections for individuals in criminal proceedings who are made to be witnesses against themselves—e.g., who have their own testimony admitted against them. See Chavez, 538 U.S. at 767. Where "a person is never made to be a 'witness' against himself in a criminal proceeding, he cannot demonstrate any violation of this Fifth Amendment right." R&R at 14 (citing Chavez, 538 U.S. at 766). Because the only basis for Smith's claim is that he did not receive a Miranda warning, and because Smith was not compelled to be a witness against himself in a criminal prosecution, the magistrate judge properly recommended summary judgment on this count. R&R at 14.

Smith reasserts in his objections that he was not read his Miranda rights. See Obj. at 10. Smith submits that he made "involuntary statements" in response to "questions likely to generate self-incriminating questions," which Weiler then used to "induce criminal proceedings" against Smith. Id. Thus, states Smith, Defendants have violated his Fifth Amendment right against self-incrimination. Id.

Smith's objection fails to address the R&R's explanation at all. Like the unsuccessful litigant in Chavez, Smith "was never made to be a 'witness' against himself in violation of the Fifth Amendment's Self-Incrimination Clause because his statements were never admitted as

10

testimony against him in a criminal case." 538 U.S. at 767. Smith presents no evidence that the criminal proceedings following his arrest—at which he was reportedly cleared of all charges—featured any of the "involuntary statements" Smith made to the police officers. Smith has failed to allege—let alone prove—facts that give rise to a Fifth Amendment claim, and so summary judgment is proper.

### C. Monell Liability

Smith brings Monell claims against Aims, Davison, and the Luna Pier Police Department for failure to properly hire and supervise Weiler. See Compl. at PageID.22, 24–25 (basing claim in "[n]egligent hiring, firing, training, and disciplining" of Weiler); Resp. to Mot. Summ. J. at 13–14 (clarifying that this claim is founded in Monell). Smith sues Aims and Davison in "their official and professional capacity." Compl. at PageID.23. When a litigant brings a Monell claim against an individual in his or her official capacity, that "suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity." Kentucky v. Graham, 473 U.S. 159, 166 (1985) (citations omitted, emphasis in original). Smith's Monell claims against Davison and Aims are, therefore, most appropriately interpreted as claims against the City of Luna Pier. As the magistrate judge explained, Smith's claim against the Luna Pier Police Department fails because a police department cannot be sued as a distinct entity under Michigan law, see R&R at 17 (citing Boykin v. Van Buren Twp., 479 F.3d 444, 450 (6th Cir. 2007)); however, even if construed as a claim against the City of Luna Pier, this claim is unsuccessful for the reasons that follow.

The magistrate judge found that Smith had failed to establish a claim under Monell. See id. at 15–17.[6] There was no "'underlying constitutional violation,'" which on its own defeats a

---

[6] To prevail on a Monell claim, a plaintiff must demonstrate that the alleged federal violation occurred because of a municipal policy or custom. Burgess v. Fischer, 735 F.3d 462, 478 (6th Cir. 2013) (citing Monell, 436 U.S. at 694). There are four ways a plaintiff can show an illegal policy or custom: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." Id. To establish a "failure to train" claim, Smith must show "(1) a

11

Monell claim. Id. at 16 (quoting Robertson v. Lucas, 753 F.3d 606, 622 (6th Cir. 2014)). Furthermore, Smith's Monell claim does not allege—let alone prove—any "facts from which one could conclude a 'clear and persistent pattern' of misconduct existed with respect to any hiring, training, or supervision practices." Id. (emphasis in original) (quoting Razmus v. Kent Cnty., No. 1:20-CV-451, 2021 WL 5504819, at *5 (W.D. Mich. Nov. 24, 2021) (punctuation modified)).[7]

Smith hurls multiple objections at the magistrate judge's findings, but none can make a dent in the R&R's iron-clad conclusions. Smith first states that, on the day of his arraignment for the domestic violence charge, "[f]ive (5) unlawful search and seizures from allegations of domestic violence were dismissed by the Magistrate." Obj. at 11. Smith asserts that these dismissals are evidence of "a custom of deprivation of constitutional rights" of which Defendants should have been aware. Id.

To prevail on this objection, Smith must show that the City of Luna Pier should have been aware of—but deliberately ignored—"a clear and persistent pattern of illegal activity" or of "misconduct," which caused the deprivation of Smith's constitutional rights. Osberry, 750 F. App'x at 397 (punctuation modified). Smith's curt assertion that five charges of domestic violence were dismissed on a single day when Smith happened to be in court—apparently arguing that his unconstitutional arrest was just one example of a broader practice of malfeasance—cannot carry this burden. Smith cites no authorities suggesting that the dismissal of charges following an arrest

---

clear and persistent pattern of illegal activity, (2) which the City knew or should have known about, (3) yet remained deliberately indifferent about, and (4) that the City's custom was the cause of the deprivation of her constitutional rights." Osberry v. Slusher, 750 F. App'x 385, 397 (6th Cir. 2018) (punctuation modified).

[7] Magistrate Judge Grand also noted that Smith's § 1983 claims against Aims and Davison would fail if based not in Monell but in a theory of supervisory liability. R&R at 15–16. Section 1983 does not allow for supervisory liability; supervisors are liable only if they "actively engaged in unconstitutional behavior." Gregory v. City of Louisville, 444 F.3d 725, 751 (6th Cir. 2006). The R&R found that Smith cannot prove Aims's and Davison's personal involvement with the alleged constitutional violations, and in fact, Smith explicitly conceded that Aims "'walked out'" of the chief of police job and gave up "'exclusive control over the police officers.'" R&R. at 15 (quoting Compl. at PageID.22). Smith does not challenge these findings in his objections, which focus on Monell.

12

means that the original arrest constituted "misconduct" or "illegal activity," and indeed, this broad interpretation of the Monell standard conflicts with case law. See, e.g., Bickerstaff v. Cuyahoga Cnty., No. 1:18CV1142, 2020 WL 5626692, at *12 (N.D. Ohio Sept. 21, 2020) (finding that plaintiff—who was found not guilty of charges deriving from an arrest that she claimed was unlawful—had failed to allege a plausible Monell claim because she did not "identif[y] an informal custom on the part of the City to direct its police officers to engage in" wrongful arrests or allege that "any of the Officer Defendants had a history of making prior wrongful arrests . . ."). As explained, "the mere fact that the suspect is later acquitted of the offense for which he is arrested is irrelevant to the validity of the arrest." DeFillippo, 443 U.S. at 36.

Further, a handful of allegedly wrongful incidents occurring over the course of a single day do not create a "clear and persistent pattern." See Stewart v. City of Memphis, Tenn., 788 F. App'x 341, 347 (6th Cir. 2019) (finding that "one instance of potential misconduct" is not "evidence of a clear and persistent pattern") (punctuation modified). Smith's reference to dismissed charges provides no basis for finding that Luna Pier deliberately ignored a series of warning signs, that Luna Pier's failure to train police officers caused Smith's constitutional injury, or—independently fatal to Smith's cause—that there was any deprivation of constitutional rights at all. Osberry, 750 F. at 397. This objection has no merit.

Smith also asserts in a conclusory manner that Weiler has been "bounced from one police department to the other" and that Aims and Davidson "knew of the constitutional problems that Officer Drew Weiler brought on from other police departments." Obj. at 11. Smith appears not to know himself what "constitutional problems" Weiler presented, as he is unable to articulate them. As explained, the record presents no basis for finding that Weiler violated the Constitution in the instant case. The Court sees no relevance in Smith's unsupported allegation that Weiler has moved between police departments in his career. There is still no Monell claim here.

Smith further argues that the City breached its duties to train police officers "regarding the means of conducting a balanced investigation of both sides, to distinguish banter that may be common in a specific marriage as contrasted to probable cause of domestic violence in a particular

13

marriage, the necessity to properly maintain exculpatory videocam evidence, and to abide by the rule[s]." Id. at 12. Smith submits that "Weiler was not certified in the differentiation of domestic violence vs. marital disagreements," which evidences "inadequate or improper training." Id.

For Smith to establish Monell liability under § 1983 due to a municipality's failure to provide adequate training, he must show that the training was inadequate due to the municipality's deliberate indifference and that the inadequate training "was closely related to or actually caused" the constitutional injury. Ouza v. City of Dearborn Heights, Mich., 969 F.3d 265, 287 (6th Cir. 2020) (punctuation modified). Smith's objection fails on every count. Weiler's thorough investigation of each witness's perspective provides no basis for determining that he was inadequately trained on handling domestic disputes. Even if Weiler's behavior raised some concern, the actions of a single officer during a single arrest cannot establish that a municipality was deliberately indifferent to its provision of inadequate training. Id. ("[A] plaintiff must show that the defendant was aware of prior instances of unconstitutional conduct such that it was clearly on notice that the training in this particular area was deficient and likely to cause injury and yet ignored a history of abuse.") (punctuation modified, emphasis added). And the absence of any constitutional injury alone is fatal to Smith's argument.

Lastly, Smith asserts that, "[d]uring the arrest procedure of the plaintiff, Officer Weiler was in direct communication with either Tim Aims or his deputy," who "encourage[d]" Weiler to arrest Smith. Obj. at 13. Smith provides no factual basis to support this assertion, nor an explanation regarding how Weiler's communication with his colleagues during the course of the arrest would create a Monell claim.

Smith has assayed multiple theories for attributing liability to others for an arrest that flowed from an officer's probable cause to believe Smith had engaged in domestic violence. All of these theories fail. The Court adopts the magistrate judge's recommendation to grant summary judgment to Defendants on Smith's Monell claims.

### D. Negligence

Magistrate Judge Grand leniently read Smith's complaint to allege a negligence claim against Davison based on the mayor having "'disregarded the past history of unreliability of Drew Weiler'" when hiring him. R&R at 18 (quoting Compl. at PageID.25). The magistrate judge found that Davison was immune from this charge under the Michigan Governmental Tort Liability Act, which provides that the "'highest appointive executive official'" is "'immune from tort liability for injuries to persons or damages to property if he or she is acting within the scope of his or her . . . executive authority.'" Id. (quoting Mich. Comp. L. § 691.1407(5)).

Smith objects that Davison "has not yet provided an authenticated, true and accurate copy" of the body camera footage, noting that the "time stamp on the videotape is discontinuous." Obj. at 15. On this basis, Smith asserts that Davidson "was not engaged in the exercise or discharge of a governmental [function] at the time of the spoliation of the evidence." Id. Smith apparently alleges that Davison was acting ultra vires, which would defeat a defense of immunity. See Smith v. Priebe, No. 292709, 2010 WL 4908241, at *2 (Mich. Ct. App. Dec. 2, 2010).

Smith is correct that the seven segments of body camera footage are "discontinuous" in that there are apparent gaps between certain segments: about eight minutes between Smith's placement in Weiler's police vehicle and his transportation to Monroe County Jail, see Body Camera at 21:29:30, 21:37:28; about eleven minutes between the last footage of Smith's first trip to the jail and Smith's return to the police vehicle to drive to the hospital, see id. at 21:48:42, 22:00:29; and about an hour and thirteen minutes between the last footage of Smith at the hospital and brief footage of Smith back at Monroe County Jail, see id. at 22:33:04– 23:45:54. Smith's concerns with these gaps are unfounded. There is no missing footage of the events relevant to Smith's claims: that is, Weiler's investigation of the facts at Smith's residence and the Iron Coffins Motorcycle Club that led to Smith's arrest. See id. at 20:21:47–20:54:04; 20:59:40–21:29:30. Smith does not assert in his objections that any footage relevant to his claims has been excluded. On the face of the footage, the Court sees no issue with occasional gaps that apparently include

15

periods when Weiler was not in Smith's company, like when Smith used the restroom at the jail. See id. at 21:48:42.

Regardless, Smith's allegations cannot defeat Davison's immunity defense. Smith has neither alleged nor proven any facts suggesting that there was inappropriate tampering with evidence or that the mayor of Luna Pier was personally involved with such tampering. To the extent that Smith accuses Davison of general carelessness in his oversight of police operations, such oversight falls within "the scope" of his "executive authority." Mich. Comp. L. § 691.1407(5)). Davison's immunity stands, and Smith's negligence claim fails.

Smith also argues that Davison and Aims had "a duty to ensure that officer[s] would investigate properly" and take actions consistent with the Americans with Disabilities Act (ADA), which duty they breached when Weiler "failed to identify the party who actually started the marital discord." Obj. at 15. This claim fails for multiple reasons, not the least of which being that Smith is barred from raising new issues for the first time in his objections to an R&R. See Uduko, 975 F. Supp. 2d at 757. Like Mayor Davison, Police Department Chief Aims is immune from suits in negligence for actions taken within the scope of his executive authority. See Petipren v. Jaskowski, 833 N.W.2d 247, 262 (Mich. 2013). The undisputable factual record also provides no basis for finding that Weiler was negligent in his investigation of the dispute. Summary judgment is proper on Smith's negligence claims.

### E. Private Nuisance

Magistrate Judge Grand found that "there is nothing in Smith's complaint that even begins to resemble a private nuisance claim." R&R at 19 (citing Adkins v. Thomas Solvent Co., 487 N.W.2d 715, 719 (Mich. 1992)). In his objections, Smith continues his attempt to state a private nuisance claim, asserting that his detainment in police custody constituted "a substantial interference with the rights to enjoyment" of his property because his arrest obstructed Smith's ability to "return home and enjoy his property." Obj. at 16. These allegations are insufficient to make out a claim in private nuisance, which requires "interference with the occupation or use of land or an interference with servitudes relating to land." Adkins, 487 N.W.2d at 720. Weiler did

16

not interact with Smith on his land at all. There is no foundation in law for Smith's theory that anyone who obstructs an individual's ability to travel to his or her home—including a police officer conducting a legal arrest—has thereby committed a nuisance. The Court accepts the R&R's recommendation on this claim.

### F. Remaining Claims

Liberally construing various issues pockmarked throughout Smith's pleadings as legal claims, the magistrate judge found that Smith's remaining arguments have no merit. See R&R at 19–22. Smith's last smattering of objections fails to undermine this conclusion.

The magistrate judge found that Smith had failed to state a claim under the ADA. R&R at 20. Smith now argues that Weiler's decision to arrest Smith was influenced by his conversation with Smith's neighbor Leichty, who called Smith a "cripple" who was capable of getting "froggy." See Obj. at 16; Body Camera at 20:51:47–20:54:04. Smith concludes that Leichty's statements were "at least a substantial factor in the arrest." Obj. at 17. As the R&R explained, an ADA claim requires an allegation of a causal connection between (i) one's protected status and (ii) the alleged exclusion from participation or denial of services (here, as alleged by Smith, his arrest). R&R at 20 (citing 42 U.S.C. § 12132). Smith offers an alleged causal connection for the first time in his objections, which is too late to raise a new issue. See Uduko, 975 F. Supp. 2d at 757. In any case, Smith's assumption that his neighbor calling him a cripple was a "substantial factor" in Weiler's decision to effect Smith's arrest—amid the wealth of evidence from which Weiler could find probable cause of domestic violence—is belied by the record. Weiler arrested Smith because an investigation gave him probable cause to believe Smith had committed a crime—not because Smith's neighbor offhandedly called Smith a cripple.

The magistrate judge also found that Smith's claim that Defendants were engaged in a "joint enterprise" or civil conspiracy under 42 U.S.C. § 1985(3) fails for multiple reasons: (i) Smith failed to bring this claim in his complaint, (ii) Smith failed to allege with specificity that the alleged conspiracy was motivated by racial or other class-based animus, and (iii) Smith failed to allege an underlying denial of civil rights. R&R at 20–21 (citing Collyer v.

17

Darling, 98 F.3d 211, 233 (6th Cir. 1996); Gutierrez v. Lynch, 826 F.2d 1534, 1538–1539 (6th Cir. 1987); Graham v. City of Mentor, 118 F. App'x 27, 32 (6th Cir. 2004)).

Smith cannot cure these defects now. He objects that the five dismissals of domestic violence charges on the day of his arraignment evidence "a policy of deliberate indifference to the plaintiff's liberty interest in a gender-neutral constitutional rights [sic]" and "[s]ex-based" discrimination. Obj. at 17. Smith concludes that there was a "conspiracy" and a "joint enterprise" to "coordinate the unlawful search and seizure of males." Id. at 17–18. Smith cannot prevail by introducing these new issues for the first time in his objections to the R&R. Uduko, 975 F. Supp. 2d at 757. Nor do any of his allegations—providing no detail about the claimed dismissals of unrelated charges against unnamed individuals—suggest with "specificity" that there was any conspiracy, Gutierrez, 826 F.2d at 1538, or that there was "class based animus" for Smith's arrest, Collyer, 98 F.3d at 233. The absence of any deprivation of civil rights stabs one more stake into the heart of Smith's claims. See Graham, 118 F. App'x at 32. Smith cannot provide any factual basis to prove that a joint enterprise or civil conspiracy caused him a constitutional injury.

### III. CONCLUSION

For the foregoing reasons, the Court overrules Smith's objections (Dkt. 59), adopts the recommendation contained in the magistrate judge's R&R (Dkt. 58), and grants Defendants' motion for summary judgment (Dkt. 30).

SO ORDERED.

Dated: March 23, 2022                   s/Mark A. Goldsmith
    Detroit, Michigan               MARK A. GOLDSMITH
                                    United States District Judge